Slip Op. 08-87

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          :
FAGERSTA STAINLESS AB,                    :
                                          :
            Plaintiff,                    :
                                          :
      v.                                  :
                                          :
UNITED STATES,                            :    Before:      WALLACH, Judge
                                          :    Court No.:   07-00153
            Defendant,                    :
                                          :
      and                                 :    **PUBLIC VERSION**
                                          :
CARPENTER TECHNOLOGY CORP.,               :
and UNIVERSAL STAINLESS & ALLOY           :
PRODUCTS, INC.,                           :
                                          :
            Defendant-Intervenors.        :
_____:

[Plaintiff's Motion for Judgment on the Agency Record is DENIED and the Agency's Determination is AFFIRMED.]


                                 Dated:        August 28, 2008

Hunton & Williams LLP (William Silverman, Richard P. Ferrin, and James R. Simoes), for Plaintiff Fagersta Stainless AB.

Gregory G. Katsas, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael Dierberg); and Hardeep K. Josan, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant United States.

Kelley Drye Collier Shannon (David A. Hartquist, Mary T. Staley, and Grace W. Kim), for Defendant-Intervenors Carpenter Technology Corp. and Universal Stainless & Alloy Products, Inc.

# OPINION

**Wallach, Judge:**

## I

## INTRODUCTION

This action arises out of the administrative review of an antidumping duty order conducted by the United States Department of Commerce ("Commerce"). During the course of the review, Plaintiff Fagersta Stainless AB ("Fagersta") requested that Commerce modify its existing model-match methodology by adding an additional product criterion. Commerce rejected this request on the basis that Fagersta had not demonstrated that there were "compelling reasons" to do so. Plaintiff challenges this determination.

This court has jurisdiction pursuant to 28 U.S.C. § 1581(c). For the reasons set forth below, Commerce's determination is affirmed.

## II

## BACKGROUND

On September 15, 1998, Commerce published an antidumping duty order on stainless steel wire rod ("SSWR") from Sweden. <u>Notice of Antidumping Duty Order: Stainless Steel Wire Rod from Sweden</u>, 63 Fed. Reg. 49,329 (September 15, 1998). The model-match criteria applied by Commerce consisted of four product characteristics: (1) grade, (2) diameter, (3) further processing, and (4) coating. <u>See</u> Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record ("Plaintiff's Motion") at 2; Defendant's Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("Defendant's Response") at 3.

On October 25, 2005, Commerce published a notice of initiation of the administrative review on SSWR from Sweden for the period September 1, 2004 through August 31, 2005. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 70 Fed. Reg. 61,601 (October 25, 2005). As part of the administrative review, Commerce sent an antidumping duty questionnaire to Fagersta in November 2005. Defendant's Response at 2. Fagersta responded and requested that Commerce revise its model-match criteria to include electro-slag refining ("ESR") as a fifth product characteristic. Fagersta Section B Questionnaire Response, Confidential Record ("C.R.") Doc. No. 3, at B-2. In its questionnaire response, Fagersta defined electro-slag refining as a "separate and significant processing stage . . . [that] imparts unique material qualities, primarily superior fatigue resistance, to the finished wire rod product." Id.

In October 2006, Commerce published the preliminary results of this review. Stainless Steel Wire Rod from Sweden: Preliminary Results of Antidumping Duty Administrative Review, 71 Fed. Reg. 59,082 (October 6, 2006). Commerce determined that compelling reasons did not exist to modify the model-match criteria by adding electro-slag refining as a product characteristic. Id. at 59,085. In the preliminary phase of the administrative review, Commerce therefore applied the same model-match criteria to determine the "foreign like product" as in the initial "less than fair value" investigation. Plaintiff's Motion at 2; Defendant's Response at 3. Fagersta subsequently renewed its request that Commerce modify the model-match criteria to include ESR as a product characteristic. See Fagersta Stainless AB Case Brief, United States Department of Commerce, International Trade Administration, Case No. A-401-806 (November 27, 2006), C.R. Doc. 33, at 3. Commerce again declined to modify its model-match criteria. See Issues and Decision Memorandum for the Final Results of the Administrative Review of

Stainless Steel Wire Rod from Sweden ("Final Decision Memo") (April 4, 2007), Public Record

("P.R.") Doc. 102, at 9; Stainless Steel Wire Rod from Sweden: Final Results of Antidumping

Duty Administrative Review, 72 Fed. Reg. 17,834, 17,835-37 (April 10, 2007).

# III

## STANDARD OF REVIEW

The court must uphold a determination by Commerce resulting from an administrative

review of an antidumping duty order unless it is "unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); Carpenter

Tech. Corp. v. United States, 510 F.3d 1370, 1372-73 (Fed. Cir. 2007).

The substantial evidence test "requires only that there be evidence that a reasonable mind

might accept as adequate to support a conclusion." Cleo Inc. v. United States, 501 F.3d 1291,

1296 (Fed. Cir. 2007) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S. Ct.

456, 95 L. Ed. 456 (1951)).  While the court must consider contradictory evidence, "the

substantial evidence test does not require that there be an absence of evidence detracting from

the agency's conclusion, nor is there an absence of substantial evidence simply because the

reviewing court would have reached a different conclusion based on the same record." Id. (citing

Universal Camera Corp., 340 U.S. at 487-88); see also Am. Silicon Techs. v. United States, 261

F.3d 1371, 1376 (Fed. Cir. 2001); U.S. Steel Group v. United States, 96 F.3d 1352, 1357 (Fed.

Cir. 1996).

To determine whether Commerce's interpretation and application of the antidumping

statute at issue "is in accordance with the law," the court must conduct the two-step analysis

articulated by the Supreme Court in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467

U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  Under the first step of the Chevron

analysis, the court must ascertain "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Wheatland Tube Co. v. United States</u>, 495 F.3d 1355, 1359 (Fed. Cir. 2007) (citing <u>Chevron</u>, 467 U.S. at 843).

The court reaches the second step of the <u>Chevron</u> analysis only "if the statute is silent or ambiguous with respect to the specific issue." <u>Id.</u> Under this second step, the court must evaluate whether Commerce's interpretation "is based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843. The agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. <u>Zenith Radio Corp. v. United States</u>, 437 U.S. 443, 450, 98 S. Ct. 2441, 57 L. Ed. 2d 337 (1978). The court must defer to Commerce's reasonable interpretation of a statute even if it might have preferred another. <u>Id.</u>

## IV

## DISCUSSION

### A
### Legal Framework

Goods imported into the United States will be subject to an antidumping duty if Commerce determines that foreign merchandise is being sold in the United States at "less than its fair value."[1] 19 U.S.C. § 1673; <u>see also</u> <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 15 F.3d 1372, 1375 (Fed. Cir. 2008). The amount of the antidumping duty reflects the

---

[1] In addition to Commerce's less-than-fair-value determination, the International Trade Commission ("Commission") must determine that a domestic industry will be injured by imports or sales of that merchandise before antidumping duties can be imposed. 19 U.S.C. § 1673. The Commission's inquiry is not relevant to the issues raised in this case. For an overview of the administrative process involving both Commerce and the Commission that must take place before an antidumping duty order can be issued, <u>see</u> <u>Ad Hoc Shrimp Trade</u>, 515 F.3d at 1375-76, and <u>FAG Italia Spa v. United States</u>, 291 F.3d 806, 808-09 (Fed. Cir. 2002).

amount by which the home-market price of the foreign like product (the "normal value") exceeds

the price charged in the United States (the "export price"), 19 U.S.C. § 1677b(a)(1)(A)-(B); this

difference is referred to as the "dumping margin," 19 U.S.C. § 1677(35)(A).  After an

antidumping duty order is issued, the amount of the antidumping duty may be revised in

subsequent administrative reviews. 19 U.S.C. § 1675(a)(1)(B).  In an administrative review,

Commerce recalculates the normal value and export price to establish an updated dumping

margin. 19 U.S.C. § 1675(a)(2)(A)(i)-(ii).  In order to establish the dumping margin, whether in

an initial investigation or in an administrative review, Commerce must first identify the "foreign

like product" which will form the basis for comparison to merchandise exported to the United

States. See Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1375 (Fed. Cir.

2001).

**1**
**Commerce Has Considerable Discretion in Constructing a Model-Match Methodology for Identifying the "Foreign Like Product"**

Because Congress has not precisely defined the methodology by which Commerce must

identify the "foreign like product," it has implicitly delegated that authority to Commerce. New

World Pasta Co. v. United States, 28 CIT 290, 305-06, 316 F. Supp. 2d 1338, 1352 (2004)

(citing Pesquera Mares, 266 F.3d at 1384; Koyo Seiko Co. v. United States, 66 F.3d 1204, 1209

(Fed. Cir. 1995)).  Commerce has "considerable discretion" to construct a methodology for

identifying the "foreign like product" in antidumping proceedings. SKF USA, Inc. v. United

States, 2008 U.S. App. LEXIS 18159, at *13 (Fed. Cir. 2008); SKF USA Inc. v. United States,

263 F.3d 1369, 1381 (Fed. Cir. 2001).[2]  Commerce states that it does so by "devis[ing] a

___

[2]  Fagersta acknowledges that "Commerce has broad discretion in determining the appropriate model match characteristics in an antidumping proceeding." Plaintiff's Motion at 11.

hierarchy of commercially significant characteristics suitable to each class or kind of merchandise." Defendant's Response at 10.  This hierarchy of commercially significant characteristics is the "model-match methodology."  According to Commerce, it then utilizes these characteristics to "compare[] United States sales to sales in the comparison market." Id.

Pursuant to the statutory scheme, Commerce must "first look for identical merchandise with which to match the United States model to the comparable home or third country market model."[3] Viraj Forgings, Ltd. v. United States, 27 CIT 1472, 1477, 283 F. Supp. 2d 1335, 1340 (2003) (citing Torrington, 25 CIT 395, 417, 146 F. Supp. 2d 845, 874 (2001).  The Federal Circuit has established, however, that merchandise need not be exactly the same in order to be considered "identical." Pesquera Mares, 266 F.3d at 1384.  In the final analysis, Commerce states that it "considers merchandise to be identical within the meaning of section 1677(16)(A) when all the relevant characteristics match." Id. (citing Notice of Final Determination of Sales at

---

[3]  The term "foreign like product" is defined as follows:

[M]erchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise--
    (i) produced in the same country and by the same person as the subject merchandise,
    (ii) like that merchandise in component material or materials and in the purposes for which used, and
    (iii) approximately equal in commercial value to that merchandise.

(C) Merchandise--
    (i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
    (ii) like that merchandise in the purposes for which used, and
    (iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16).

Less Than Fair Value: Steel Wire Rod from Trinidad & Tobago, 63 Fed. Reg. 9,177, 9,180

(February 24, 1998)).

**2**
**A Party Seeking to Modifying an Existing Model-Match Methodology Must Meet a**
**"Compelling Reasons" Standard**

Once Commerce has established a model-match methodology in an antidumping

investigation, it will not modify that methodology in subsequent proceedings unless there are

"compelling reasons" to do so. See Final Decision Memo, P.R. Doc. No. 102, at 10 (citing Ball

Bearings and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United

Kingdom: Final Results of Antidumping Duty Administrative Review, 70 Fed. Reg. 54,711

(September 16, 2005), and accompanying Issues and Decision Memorandum at cmt. 2.

A party seeking to modify an existing model-match methodology has alternative means

to demonstrate that "compelling reasons" exist to do so.  Commerce will find that "compelling

reasons" exist if a party proves by "compelling and convincing evidence" that the existing

model-match criteria "are not reflective of the merchandise in question," that there have been

changes in the relevant industry, or that "there is some other compelling reason present which

requires a change." Notice of Final Results of the Twelfth Administrative Review of the

Antidumping Duty Order on Certain Corrosion-Resistant Carbon Steel Flat Products from the

Republic of Korea, 72 Fed. Reg. 13,086, and accompanying Issues and Decision Memorandum

at cmt. 1(b) (March 20, 2007).  Such other compelling reasons may include, for example, (1)

"greater accuracy in comparing foreign like product to the single most similar U.S. model, in

accordance with [19 U.S.C. § 1677(16)(B)];" (2) "a greater number of reasonable price-to-price

comparisons in accordance with [19 U.S.C. § 1677b];" or (3) the existence of a "specific

standard . . . that is not captured in the model-matching criteria but which is industry-wide,

commercially accepted and recognizes material physical characteristics of various types for the particular product at issue." Final Decision Memo, P.R. Doc. No. 102, at 10, 14-15.

Commerce's stated position that it will not modify an existing model-match methodology absent "compelling reasons" has been recognized as a reasonable means of interpreting the statute. See, e.g., SKF USA Inc. v. United States, 491 F. Supp. 2d 1354, 1363 (CIT 2007) ("Commerce does indeed express its preference for maintaining a stable methodology across reviews unless compelling reasons exist."), aff'd, 2008 U.S. App. LEXIS 18159; Mittal Steel USA, Inc. v. United States, Slip Op. 07-117, 2007 Ct. Int'l Trade LEXIS 138, at *8-*9 (August 1, 2007) ("For Commerce, the need for consistency in the model match criteria stems from its duty to calculate antidumping rates as accurately as possible.") (citing Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).

Fagersta does not contest the lawfulness of the "compelling reasons" standard. Plaintiff's Motion at 11. Nor does Fagersta dispute that Commerce may define products as "identical" even if those products are not exactly the same. Id. at 10. Instead, Fagersta argues that it sufficiently demonstrated to Commerce that ESR and non-ESR SSWR are not "identical," id., and thus that the existing "model match is not reflective of the merchandise in question," id. at 29. In addition, Fagersta contends that it sufficiently demonstrated that there are other "compelling reasons" for Commerce to modify the existing model-match methodology. Id. at 11. Fagersta has not sufficiently demonstrated either of these positions. Accordingly, Commerce's designation of ESR SSWR and non-ESR SSWR as identical is both in accordance with law and supported by substantial evidence. Likewise, Commerce's determination that Fagersta did not otherwise provide "compelling reasons" to add ESR as a product characteristic to the existing model-match methodology is in accordance with law and supported by substantial evidence.

**B**

**Commerce's Designation of ESR SSWR and Non-ESR SSWR as "Identical" Products is Based on a Reasonable Interpretation of the Relevant Statute and Supported by Substantial Evidence**

Fagersta frames the issue in this case as "whether ESR SSWR is so similar to non-ESR SSWR to . . . justify Commerce treating them as <u>identical</u>." Plaintiff's Motion at 10. To that end, Fagersta raises the question "whether the products are 'the same with minor differences.'" <u>Id.</u> Based on Commerce's interpretation of the word "identical," as discussed in Sub-section (A)(1) above, the court must determine whether Fagersta has demonstrated that any differences between ESR SSWR and non-ESR SSWR are "commercially significant." <u>See</u> <u>Pesquera Mares</u>, 266 F.3d at 1384. The court will also evaluate Fagersta's contention that, in determining the structure of the model match, Commerce has "simply brushed aside" the price and cost differences between ESR SSWR and non-ESR SSWR that it placed on the record below. <u>See</u> Plaintiff's Motion at 18.

**1**

**Fagersta Has Not Demonstrated That Any Differences That Exist Between ESR SSWR and Non-ESR SSWR are "Commercially Significant"**

According to Fagersta, electro-slag refining is "a complex production process that reduces the number and segregation of non-metallic inclusions, thereby resulting in a 'cleaner' steel with superior fatigue resistance and other important product characteristics." Plaintiff's Motion at 3. Fagersta placed on the record below various technical reports and other evidence demonstrating what it asserts are the physical differences, primarily "superior fatigue resistance," between ESR SSWR and non-ESR SSWR. <u>See, e.g.,</u> Fagersta Section B Questionnaire Response, C.R. Doc. No. 3, at Exhibit B-1 (product specification sheets); Fagersta Supplemental Sections A-C Response, C.R. Doc. No. 14, at Exhibits S-6 to S-8, S-10 to S-12

(technical literature and test data).[4]  This "superior fatigue resistance," asserts Fagersta, is a

result of the "significant reduction in non-metallic inclusion content in ESR treated . . .

products." Plaintiff's Motion at 15.  Further, Fagersta represents that additional product

characteristics, such as maximum levels of various chemical compounds, are requested by the

customer to whom it sells the ESR SSWR. Id.  Fagersta claims that, to the best of its knowledge,

this specific product (i.e., SSWR with maximum levels of various chemical compounds as well

as a maximum number of inclusions) cannot be produced without using the ESR process. Id.

Fagersta argues that "Commerce simply dismissed" these physical differences. Id. at 16.

     In response, Commerce explains that it constructs its model-match methodology by

"devis[ing] a hierarchy of commercially significant characteristics." Defendant's Response at 10

(emphasis added).  Commerce then asserts that it "did not contest that ESR-treated SSWR has

different properties than some other SSWR products," but rather that "Fagersta did not establish

that these properties were unique to ESR-treated merchandise." Defendant's Response at 12.  In

its Final Decision Memo, Commerce stated that "many factors and/or different production steps

could affect the final SSWR product with respect to both its internal characteristics (e.g.,

impurities or inclusion, dimensional tolerances) and its external characteristics (e.g., surface

imperfections)." Final Decision Memo, P.R. Doc. No. 102, at 14.[5]  Based on this statement,

Defendant-Intervenors argue that Commerce "established that the ESR product was not

---

[4]  Fagersta asserts that "Commerce did not request additional information from Fagersta to support this point, or dispute, in the final results, th[is] information," and this "silence is a concession that [Commerce] either accepted the truth of the information . . . or never considered the information in the first place." Plaintiff's Reply at 3.  Fagersta provided no citations in its briefs nor at oral argument for its proposition that "silence" by Commerce in an administrative proceeding is necessarily a concession of the veracity of a party's position.

[5]  At oral argument, Commerce stated that a different analysis might have been called for if Fagersta had requested that ESR SSWR be distinguished from SSWR that had undergone other remelting processes such as "vacuum arc refining," for example.  Fagersta confirmed that it did not make such a request.

significantly different than the non-ESR product . . . ." Defendant-Intervenors' Response Brief ("Defendant-Intervenors' Response") at 14.[6]

Commerce has interpreted the word "identical" to mean the same with "minor differences in physical characteristics, if those minor differences are not commercially significant," and this interpretation has been upheld as a "permissible construction of the statute." Pesquera Mares, 266 F.3d at 1384 (quoting Chevron, 467 U.S. at 843). Commerce has not explained what it considers a "commercially significant" difference in physical characteristics, and appears to conduct a case-by-case assessment each time it determines whether products are identical. See, e.g., New World Pasta Co., 28 CIT at 309 n.20; Pesquera Mares Australes Ltda. v. United States, 24 CIT 443, 447 n.1 (2000), aff'd, 266 F.3d 1372 (Fed. Cir. 2001). Indeed, the Federal Circuit has established that Commerce's commercial significance determination is subject to review under the "substantial evidence" standard, Pesquera Mares, 266 F.3d at 1384. In Pesquera Mares, the court affirmed Commerce's decision to treat "premium" and "super-premium" salmon as identical, partly because that distinction was only reflected in the grading standards of the Chilean salmon industry and not in any of the other of the "world's largest salmon farming countries." Id.

In this case, Fagersta has not demonstrated that the differences between ESR SSWR and non-ESR SSWR are commercially significant. In its response to Commerce's questionnaire, Fagersta stated that it produces and sells SSWR according to its own internal grading system

---

[6] In their Response and at oral argument, Defendant-Intervenors set forth a number of arguments purporting to characterize global practices in the steel industry with respect to SSWR, see Defendant-Intervenors' Response at 3, and attempting to establish that the use of ESR is not necessary to manufacture the precise product at issue in this case, see id. at 17, 21, in support of Commerce's final determination. Defendant-Intervenors did not provide citations to authority for any of these propositions. Defendant-Intervenors stated, at oral argument, that those assertions were authoritative because that they had made those arguments in the administrative proceeding below and Fagersta had not contested them. Given the lack of evidence in the record, no weight has been given to those assertions in this analysis.

which, according to Fagersta, is more specific than the grading system established by either the

American Iron and Steel Institute ("AISI") or the American Welding Society ("AWS"). Fagersta

Section C Questionnaire Response, C.R. Doc. No. 4, at C-4.  Fagersta also stated that its internal

grades "occasionally do not have a comparable AISI or AWS counterpart." Fagersta Section A

Questionnaire Response, C.R. Doc No. 1, at A-39.  Fagersta has not disputed that both categories

of SSWR produced by Fagersta fit within the same commercial grade established by the AISI,

Final Decision Memo, P.R. Doc. No. 102, at 11, without regard to their respective levels of

inclusions or fatigue resistance or any other characteristic.  What Fagersta has asserted is that

"AISI and other grade designation schemes do not fully capture certain physical distinctions."

Fagersta Section B Questionnaire Response, C.R. Doc. No. 3, at B-2.  Fagersta has placed no

evidence on the record which demonstrates that any relevant industry grading standards reflect a

distinction based on the use of ESR technology in the production of SSWR.  Thus, because

Commerce can reasonably rely on industry grading standards to assess commercial significance,

see Pesquera Mares, 266 F.3d at 1384-85, Commerce's decision not to modify the existing

model-match methodology to incorporate ESR as an additional product characteristic is both in

accordance with law and supported by substantial evidence.

**2**
**Commerce is Not Required to Adjust for Differences in Price and Cost Between Products**
**When Those Products Are Identical**

According to Fagersta, "ESR-treated merchandise is significantly more costly to make,

and carries a significant price premium in the market, compared to non-ESR-treated

merchandise." Plaintiff's Motion at 18.  In support of this assertion, Fagersta sets out the

difference between the weighted-average price of ESR SSWR and the average price of non-ESR

SSWR, and the total cost of manufacture, across the three control numbers to which those

products were assigned. Id.  Fagersta contends that Commerce "should have placed great weight on the differences in price and cost" between these products. Id. at 21.

First, Fagersta asserts that "Commerce routinely considers prices and costs in the structure of the model match," and cites to two recent decisions issued by Commerce in support of that proposition. See id. at 36 (citing Metal Calendar Slides from Japan: Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 71 Fed. Reg. 36,063, and accompanying Issues and Decision Memorandum at cmt. 1 (June 23, 2006), and Certain Corrosion Resistant Carbon Steel Flat Products from Canada, Final Results of Antidumping Duty Administrative Review, 70 Fed. Reg. 13,458, and accompanying Issues and Decision Memorandum at cmt. 1 (March 21, 2005)).

Those decisions do not support that proposition.  Commerce states that it did not switch the hierarchical order of two model-matching criteria in Metal Calendar Slides from Japan, 71 Fed. Reg. 36,063, because the petitioner "did not demonstrate that the differences in functionality, production, or pricing, and marketing were sufficient to overturn the established methodology."  Final Decision Memo, P.R. Doc. No. 102, at 16.  Similarly, Commerce states that it decided not to include a certain characteristic in the model-match criteria in Carbon Steel Flat Products from Canada, 70 Fed. Reg. 13,458, in part because there were no significant price differences associated with it, and in part because the respondent had not demonstrated other compelling reasons – such as new technological developments and/or an industry-wide, commercially accepted standard. Id.

Second, Fagersta criticizes Commerce for not "address[ing] the significance of the difference in production costs between ESR SSWR and non-ESR SSWR, particularly in light of

14

Commerce's DIFMER test." Id. at 34.  Fagersta summarizes the test as follows:

> (1) comparison between non-identical, or "similar," products with differences in variable production costs representing more than twenty percent of total manufacturing costs are forbidden, even with an adjustment to normal value to account for the difference; and

> (2) when comparing non-identical, or "similar," merchandise an adjustment to normal value is made to account for the differences in variable production costs.

Id. at 23.

That summary is not accurate.  Commerce is required to make adjustments to reflect the difference in price between home market sales and sales in the United States when that difference in price arises because the foreign like product is not "identical" to the domestic product to which it is being compared. See 19 U.S.C. § 1677b(a)(6)(C)(ii).  In such a case, Commerce must make an adjustment to normal value for the "difference in cost attributable to the difference in physical characteristics." Viraj Forgings, 27 CIT at 1478-79 (quoting Mitsubishi Heavy Indus. v. United States, 23 CIT 326, 340, 54 F. Supp. 2d 1183, 1196 (1999)). This adjustment is commonly referred to as the difference in merchandise ("DIFMER") adjustment. See U.S. Import Administration, Policy Bulletin 92.2, Differences in Merchandise; 20% Rule (1992) ("DIFMER Policy Bulletin"); see also Mitsubishi Heavy Indus. v. United States, 275 F. 3d 1056, 1059 n.2 (Fed. Cir. 2001).  A DIFMER calculation exceeding twenty (20) percent does not result in an absolute prohibition of on comparing the products at issue, as Fagersta asserts; rather, it creates a "presumption of noncomparability." Mitsubishi Heavy Indus., 275 F.3d at 1059 n.2; see DIFMER Policy Bulletin at 2.  Any comparison of products with a DIFMER exceeding twenty (20) percent "shall be noted and fully explained." DIFMER Policy Bulletin at 3.

Commerce urges the court not to consider Fagersta's DIFMER argument on the basis that Fagersta did not raise this argument in the administrative proceeding below and thus, according to Commerce, failed to exhaust its administrative remedies.[7] Defendant's Response at 19.  The Federal Circuit has affirmed that "the application of 'exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade,'" <u>Agro Dutch Indus. Ltd. v. United States</u>, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (citing <u>Corus Staal BV v. United States</u>, 502 F.3d 1370 (Fed. Cir. 2007)).  However, it is not necessary to address Commerce's objection in detail because, as discussed above, Commerce is not required to take cost differences into account when the products being compared are identical, <u>see</u> 19 U.S.C. § 1677b(a)(6)(C)(ii), and thus Fagersta's arguments with respect to DIFMER fail as a matter of law.

**C**
**<u>Commerce's Determination that Fagersta Did Not Establish Other "Compelling Reasons"</u>**
**<u>to Modify the Model Match Criteria is Both In Accordance With Law and Supported by</u>**
**<u>Substantial Evidence</u>**

Fagersta contends that it has demonstrated other "compelling reasons" for Commerce to modify its existing model-match methodology.  Specifically, Fagersta claims that it has demonstrated that adding electro-slag refining to the model-match criteria would result in (1) greater accuracy in comparing the foreign like product to the single most similar U.S. model, <u>id.</u> at 12; and (2) a greater number of reasonable price-to-price comparisons," <u>id.</u>; and would also (3) reflect a new technological development with respect to SSWR, <u>id.</u> at 29.  Fagersta, however, has neither made any of these showings nor demonstrated any other compelling reason for

---

[7] Fagersta confirmed at oral argument that it did not raise the DIFMER argument during the briefing phase of the administrative proceeding below; the parties agreed that Fagersta did not raise the issue until the hearing in the administrative proceeding.

Commerce to modify its existing model-match methodology.

**1**

**Fagersta Has Not Demonstrated That Adding Electro-Slag Refining to the Model-Match Methodology Will Result in Greater Accuracy in Comparing the Foreign Like Product to the Single Most Similar U.S. Model**

Fagersta asserts that adding electro-slag refining to the existing model-match methodology would result in greater accuracy in comparing the foreign like product to the single most similar U.S. model. Plaintiff's Motion at 12; Plaintiff's Reply Brief ("Plaintiff's Reply") at 13. According to Fagersta, while both ESR SSWR and non-ESR SSWR are sold in the home market, only non-ESR SSWR is sold in the United States. Plaintiff's Motion at 12. Because the current model-match methodology does not distinguish between the two products, the comparison price for U.S. sales of non-ESR SSWR is calculated based on the weighted average prices of home market sales of both ESR SSWR and non-ESR SSWR. Id.

Commerce notes that its current model-match methodology compares home market sales of SSWR to U.S. sales of SSWR that fall within the same AISI grade, and that both ESR and non-ESR SSWR are captured in that grading category. Final Decision Memo, P.R. Doc. No. 102, at 11. On this basis, Commerce determined that by adding ESR to the model-matching criteria, "the home market price and production costs of the SSWR grade at issue . . . are artificially lowered when compared to sales of the same grade in the U.S. market." Id. Therefore, Commerce reasons, "including ESR as a model-matching criterion will not result in greater accuracy with respect to product comparisons involving the SSWR grade at issue." Id. Commerce further reasons that because the use of ESR "is limited to the production of one AISI-equivalent grade in this review, inclusion of ESR as a model-matching characteristic will not result in greater accuracy with respect to comparing the remaining foreign like product." Id.

Fagersta argues that Commerce's methodology results in a "significant inaccuracy" and

that its proposed modification would "correct this significant inaccuracy by matching U.S. sales

of the non-ESR product . . . to the weighted average prices of home market sales of only the truly

identical non-ESR product . . . because the ESR product would no longer be treated as identical."

Plaintiff's Motion at 12.  In support of this proposition, Fagersta states that "[i]t cannot be

disputed that matching sales of the truly identical product is more accurate than matching the

U.S. sales price to a home market basket of the truly identical product and a vastly dissimilar and

superior product that costs roughly double to produce." Id.  Moreover, Fagersta argues,

"Commerce failed to explain . . . what could possibly be 'artificial' about a comparison market

price consisting of only sales of a truly identical product."  While Commerce correctly pointed

out that products need not be truly identical in order to be considered identical within the

meaning of 19 U.S.C. § 1677(16)(A), Defendant's Response at 10 (citing Pesquera Mares, 266

F.3d at 1383-84), Fagersta responds that "a 'compelling reason' must necessarily include a

modification that is required to conform the model match to the governing law," Plaintiff's

Reply at 3.

   The governing law – in this case, 19 U.S.C. § 1677(16)(A) and the Federal Circuit's

clarification of the appropriate interpretation of the terms contained therein – does not compel

the outcome sought by Fagersta.  The Federal Circuit recognized that interpreting the term

"identical" in 19 U.S.C. § 1677(16)(A) to require exact identity "would frustrate the purpose of

the [antidumping] statute." Pesquera Mares, 266 F.3d at 1383.  The court also observed that

"Congress could hardly have intended to require Commerce in each and every instance to

compare all the physical characteristics of the goods." Id. (citation omitted).  Thus, Fagersta's

argument that "matching sales of the truly identical product is more accurate" is unavailing.

Because Commerce is not required to match only products that are truly identical, Fagersta

would have to prove that the differences between ESR SSWR and non-ESR SSWR are commercially significant and, thus, that Commerce's characterization of those products as identical does not conform to the governing law. As discussed in detail in Section IV(B)(1) above, Fagersta has not made such a showing and Commerce's designation of ESR SSWR and non-ESR SSWR as identical is both in accordance with law and supported by substantial evidence.

**2**

**Fagersta Has Not Demonstrated That Adding Electro-Slag Refining to the Model Match Methodology Will Result in More Reasonable Price-to-Price Comparisons**

Fagersta asserts that adding electro-slag refining to the existing model-match methodology will result in more reasonable price-to-price comparisons. Plaintiff's Motion at 16-17; Plaintiff's Reply at 13-14. Specifically, Fagersta submits that its sales of AISI Grade 20 ESR SSWR in its home market constitutes [[ a certain ]] percent of its total reported market home sales, while its sales of AISI Grade 20 non-ESR SSWR constitutes [[ a different ]] percent of its home market sales, and that its sales of non-ESR SSWR in the United States accounts for [[ a certain ]] percent of its total U.S. sales. Plaintiff's Motion at 16-17. Thus, Fagersta argues, "the comparison market of fully [[ a certain ]] percent of [its] home market sales has been inaccurately calculated" because Commerce treated ESR SSWR as identical to non-ESR SSWR. Id. at 17.

Fagersta's argument is unavailing, as it assumes that is unreasonable for Commerce to treat ESR SSWR and non-ESR SSWR as "identical." As discussed in Section IV(B)(1) above, there is nothing unreasonable about Commerce's decision to treat as identical two products that are assigned the same commercial grade according to the AISI grading system, particularly in light of the fact that Fagersta has not put forth any evidence that the distinction between ESR

SSWR and non-ESR SSWR is reflected in any relevant commercial grading system. If Commerce's interpretation of the term "identical" to include products that have minor differences that are not commercially significant is reasonable, then it follows that conducting price comparisons between those products is also reasonable.

**3**
**Fagersta Has Not Demonstrated That ESR is a New Technological Development in the SSWR Industry**

Fagersta states that it placed "undisputed evidence on the record stating that the ESR process was not used to produce SSWR until after the investigation." Plaintiff's Motion at 28. In addition, Fagersta argues that "it is not necessary to show that ESR is a new technological development," as "this is merely one of the factors that Commerce considers in determining whether to alter its model match criteria." Id. at 29 (citing SKF USA, Inc., 491 F. Supp. 2d at 1358 n.2).

Fagersta is not required to prove that ESR is a new technological development in the SSWR industry in order to meet the "compelling reasons" standard because, as discussed in Section IV(A)(2) above, a party seeking to demonstrate that there are "compelling reasons" for Commerce to modify an existing model-match methodology has several alternative means to do so. However, because Fagersta has not demonstrated any other compelling reason, it would have to demonstrate that ESR is a new technological development in the SSWR industry in order to prevail.

Commerce acknowledged that ESR was not used during the production of SSWR until after the initial antidumping investigation. Defendant's Response at 15. Nevertheless, Commerce determined that this was insufficient to establish that ESR is a new technological advancement to the SSWR industry, id., and this determination was supported by substantial

evidence.

## V

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is DENIED and

Commerce's determination in <u>Stainless Steel Wire Rod from Sweden: Final Results of</u>

<u>Antidumping Duty Administrative Review</u>, 72 Fed. Reg. 17,834 (April 10, 2007), as amended by

72 Fed. Reg. 26,337 (May 29, 2007), is AFFIRMED.


         _/s/ Evan J. Wallach_____
         Evan J. Wallach, Judge



Dated:       August 28, 2008
              New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                        :
FAGERSTA STAINLESS AB,                  :
                                        :
            Plaintiff,                  :
                                        :
      v.                                :
                                        :
UNITED STATES,                          :        Before:      WALLACH, Judge
                                        :        Court No.:    07-00153
            Defendant,                  :
                                        :
      and                               :
                                        :
CARPENTER TECHNOLOGY CORP.,             :
and UNIVERSAL STAINLESS & ALLOY         :
PRODUCTS, INC.,                         :
                                        :
            Defendant-Intervenors.      :
_____:
```

ORDER AND JUDGMENT

This case having come before the court upon the Motion for Judgment on the Agency Record filed by Fagersta Stainless AB ("Plaintiff's Motion"); the court having reviewed all pleadings and papers on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED ADJUDGED AND DECREED that Plaintiff's Motion is DENIED; and it is further

ORDERED ADJUDGED AND DECREED that the decision of the United States Department of Commerce in Stainless Steel Wire Rod from Sweden: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 17,834 (April 10, 2007), as amended by 72 Fed. Reg. 26,337 (May 29, 2007), is hereby AFFIRMED; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the court in writing on or before Friday, September 5, 2008, whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter.  The parties shall suggest alternative language for any portions they wish deleted.  If a party determines that no information needs to be deleted, that party shall so notify the court in writing on or before September 5, 2008.


_/s/ Evan J. Wallach_____
Evan J. Wallach, Judge


Dated: August 28, 2008
           New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                       Deputy Clerk